# NO. 12-18-00039-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *ALFRED EUGENE SIMPSON,*<br>*APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Alfred Eugene Simpson appeals from his conviction for aggravated assault with a deadly weapon. In two issues, he challenges the sufficiency of the evidence. We affirm.

## BACKGROUND

The State charged Appellant with intentionally, knowingly, and recklessly causing bodily injury to Robert Spencer, Sr. by striking him with a pole and a walking stick, and using or exhibiting a deadly weapon, to-wit: a pole and walking stick, during commission of the assault. The indictment also alleged a prior felony conviction for injury to a child. Appellant pleaded "not guilty" to the charges against him.

The trial record demonstrates that Spencer and Kimberly Simpson, Appellant's wife, are the parents of five children. According to Spencer and his fiancé Cawandra Mooreing, they attempted to return the children to the hotel where Kimberly and Appellant were staying, but no one answered the door. Because the children were concerned about their mother, Mooreing called police to conduct a welfare check. Tyler Police Officer Joshua Smedley testified that he conducted the welfare check, but no one answered the door. When he obtained a key from the hotel clerk and opened the door, he encountered Appellant and Kimberly. Both appeared to be intoxicated.

Smedley told them that Spencer was trying to return the children to Kimberly. He then notified Spencer that Kimberly was okay.

Subsequently, Mooreing and Spencer went to the Motel 6 to meet Kimberly and Appellant to return the children. The record indicates that the Motel 6 is across the street from where Kimberly and Appellant were staying. Mooreing testified that when she first saw Kimberly and Appellant approaching, Appellant had a pole in his hand. Shortly thereafter, she saw Appellant swing the pole at Spencer's head and hit Spencer with the pole. Spencer's oldest son ran to help, and Appellant struck the son with either his hand or the pole. Spencer and Appellant began fighting, during which Mooreing and Kimberly also became involved in a physical altercation. Kimberly struck Mooreing in the head with an object that Mooreing later discovered to be a gun.[1] People from the hotel ran out to stop the fighting, after which Mooreing called 911.

Spencer, who admitted having other altercations with Appellant, testified that when he first saw Appellant and Kimberly, he saw something in Appellant's hand, like a pole or stick, but he was not concerned. When he was hugging his children goodbye, he saw Appellant standing there with a pole. Spencer said, "I know you not fixin' to hit me with that pole." He explained that Appellant swung the pole and "from there on, [Appellant] was Babe Ruth and I was a baseball." Spencer testified that he was struck in the arm with the pole and that Appellant was also punching him. Once the fight ended, Spencer had the pole, but he denied ever hitting anyone with it. He further testified that he was unarmed. Spencer went to the doctor the following day and was diagnosed with a fracture near his eye. He was unsure if he was struck in the eye with the pole or during the subsequent altercation, but he experienced pain from the injury. He admitted that had he located Appellant after the assault, he would have done "the same thing he did to me."

Kimberly testified that Appellant always carried a wooden walking stick. On the day of the offense, she saw Spencer swinging and hitting Appellant, which knocked him to the ground. She testified that Spencer punched Appellant and cut Appellant's eyebrow. During the altercation, Kimberly saw the men struggling with a metal pole. She did not know where the pole came from, but she knew Appellant did not bring it to the scene. She further testified that Mooreing jumped on Appellant's back and cut him across the back. Kimberly explained that Appellant suffered injuries from the altercation, including cuts, gashes, scuffs, and a mark from being hit with something. She never saw anyone get hit with a pole or walking stick, but she agreed that the pole

---

[1] Officers later confirmed the weapon as a BB gun.

is a serious weapon. When the fight ended, they returned to their hotel room with the children, but were concerned about Mooreing and Spencer pursuing them because after the fight, Kimberly saw them approaching in an aggressive manner. After later being contacted by law enforcement, Kimberly told officers about the walking stick. She had no doubt that Spencer initiated the altercation and that Appellant's actions were justified.

Kimberly's mother testified that she would not be surprised if Spencer started the fight. She also testified to seeing an altercation between Appellant and Spencer in the last year before trial. Appellant's mother testified that on the day of the offense, she received communications from Mooreing that suggested an altercation between Appellant and Spencer was imminent. She also testified to a prior instance when Spencer wanted to fight Appellant, but she had never seen the two men in a physical altercation.

Tyler Police Officer Ralph Buckingham testified that on May 22, 2017, he was dispatched to a Motel 6 regarding an assault. When he arrived, he encountered Spencer and Mooreing. Both individuals were bleeding from their heads and faces and appeared to have been "beat up." Spencer held a white metal pipe.

Tyler Police Officer Donald Rutledge testified that when he made contact with Appellant, Appellant was sweating, out of breath, and had some injuries. Tyler Police Officer John Pitts testified that Appellant appeared to be bleeding from his head. Appellant refused medical treatment and refused to allow photographs of his injuries. Kimberly testified that Appellant did not want medical treatment or his injuries photographed because he wanted the police to leave. She took photographs of the injuries and delivered them to investigators for Appellant's attorney.

Detective Kenneth Gardner with the Tyler Police Department testified that Appellant told him he found the pole laying on the ground at the Motel 6. He testified that someone, who he believed was Kimberly, mentioned Appellant leaving their hotel with a walking stick. He further testified that Kimberly sent Robert a text on May 22, which stated in part, "don't be stupid since you know my husband wants to get at you for the bull shit you pulled…he can whop both y'all by himself[.]" He also confirmed that the pole, in the manner of its use, was capable of causing serious bodily injury or death.

Forensic scientist Clare Moyers testified that the stained portion of the pole was tested for DNA and results showed a mixture of two individuals. She explained as follows:

3

> Obtaining this mixture profile is 69.3 nonillion times more likely if the DNA came from Robert Spencer and one unknown individual than if it came from two unknown individuals. It's the -- obtaining the mixture was 35.5 million times more likely if it came from Alfred Simpson and one unknown individual than if it came from two unrelated unknown individuals. Both Alfred Simpson and Robert Spencer were -- could not be excluded as possible contributors. And then this is just an additional statistic where obtaining the mixture profile is 39.3 duodecillion times more likely if the DNA came from Robert Spencer and Alfred Simpson than if it came from two unrelated unknown individuals.

With respect to the unstained portion of the pole, Moyers testified to the following:

> Obtaining this mixture profile is 14.9 nonillion times more likely if the DNA came from Robert Spencer and two unknown individuals than if it came from three unrelated unknown individuals. Obtaining this mixture is 1.51 septillion times more likely if the DNA came from Alfred Simpson and two unknown individuals than from three unrelated unknown individuals. Alfred Simpson and Robert Spencer cannot be excluded as possible contributors. And obtaining this mixture is 292 septendecillion times more likely if the DNA came from Robert Spencer, Alfred Simpson, and one unknown individual than if it came from three unrelated unknown individuals.

At the conclusion of trial, the jury found Appellant "guilty" of aggravated assault with a deadly weapon and sentenced Appellant to fifteen years of imprisonment. This appeal followed.

<u>SUFFICIENCY OF THE EVIDENCE</u>

In issue one, Appellant challenges the sufficiency of the evidence to support a finding that the pole used during commission of the offense constitutes a deadly weapon. In issue two, Appellant challenges the sufficiency of the evidence to support the judgment of conviction.

**<u>Standard of Review and Applicable Law</u>**

In Texas, the ***Jackson v. Virginia*** legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. ***Brooks v. State***, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See* ***Jackson v. Virginia***, 443 U.S. 307, 316–17, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See id.*, 443 U.S. at 319, 99 S. Ct. at 2789. The evidence is examined in the light most favorable to the verdict. *Id*. A successful legal sufficiency challenge will result in rendition of an acquittal by the

4

reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982). This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

Under this standard, we may not sit as a thirteenth juror and substitute our judgment for that of the fact finder by reevaluating the weight and credibility of the evidence. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see also Brooks*, 323 S.W.3d at 899. Instead, we defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See Brooks*, 323 S.W.3d at 899–900. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id*. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The duty of a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime charged. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The sufficiency of the evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

A person commits aggravated assault with a deadly weapon when he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during commission of the assault. *See* TEX. PENAL CODE ANN. §§ 22.01(a) (West Supp. 2017), 22.02(a) (West 2011). A "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 1.07(a)(17)(B) (West Supp. 2015). A jury may consider several factors in determining whether an object is a deadly weapon, including (1) the accused's words; (2) the weapon's intended use; (3) the weapon's size and shape; (4) testimony by the victim that he feared death or serious bodily injury; (5) the severity of any wounds

inflicted; (6) the manner in which the assailant allegedly used the object; (7) the parties' physical proximity; and (8) testimony as to the weapon's potential for causing death or serious bodily injury. *Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). "No one factor is determinative, and an appellate court must examine each case on its own facts to determine whether the fact finder could have concluded from the surrounding circumstances that the object used was a deadly weapon." *In re S.B.*, 117 S.W.3d 443, 447 (Tex. App.—Fort Worth 2003, no pet.).

## Analysis

On appeal, Appellant complains that Spencer was "not even sure that the pole hit him anywhere but the arm, and there was a lack of evidence regarding the pole being able to be considered a deadly weapon….[t]he most severe injuries to Mr. Spencer were to his head, and he testified that those were caused by [Appellant's] fists." According to Appellant, "[w]hile arguably, the evidence was sufficient to establish an assault, it was not enough to establish the pole meets the Texas definition of a deadly weapon." We disagree.

With respect to whether the pole qualifies as a deadly weapon, the pertinent question is whether the pole was *capable* of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B). The jury was able to view photographs of the pole, which show a substantially sized white pole with spots of blood on various parts of the pole. Both Spencer's and Appellant's DNA was recovered from the pole. Officer Buckingham testified that the pole was metal and approximately four feet long and an inch or inch and a half in diameter. Detective Gardner opined that the pole, in the manner of its use, was capable of causing serious bodily injury or death.

Officer Buckingham testified that both Spencer and Mooreing appeared to have been beaten. The jury heard Mooreing testify that Appellant swung the pole at Spencer and heard Spencer describe himself as a baseball being struck by Babe Ruth. Spencer testified that he and Appellant were "standing side by side" when the assault began and that it hurt to be hit with the pole. He also testified to blocking the pole with his arm or Appellant was "gonna knock my head off." He testified that the eye injury occurred while Appellant was punching him with his fist and he was unsure of whether he was hit in the eye with the pole. Nevertheless, the jury was also able to view photographs of Spencer's injuries, heard Mooreing's testimony that Appellant struck

6

Spencer in the "eye part" of his head, and heard testimony that Spencer suffered a painful fracture near his eye.

As sole judge of the weight and credibility of the evidence, the jury bore the burden of reconciling the testimony and determining which evidence to believe. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Clayton*, 235 S.W.3d at 778. In doing so, the photographs of the injuries, combined with testimony that Spencer was diagnosed with a fracture, could lead the jury reasonably to conclude that the facial injury was too severe to have occurred from a punch, as opposed to a strike from a metal pole. *See Clayton*, 235 S.W.3d at 778 (jury's duty includes drawing reasonable inferences from basic facts to ultimate facts). Based on evidence regarding the pole's size and shape, Spencer's and Mooreing's testimony, photographs of Spencer's injuries, the manner in which Appellant used the pole, the close physical proximity between the parties at the time of the attack, and Detective Gardner's testimony as to the pole's potential for causing death or serious bodily injury, the jury could reasonably conclude that the pole, in the manner of its use or intended use, was capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B); *see also Romero*, 331 S.W.3d at 83; *Mass v. State*, No. 01-12-01004-CR, 2014 WL 298439, at *4 (Tex. App.—Houston [1st Dist.] Jan. 28, 2014, no pet) (mem. op.) (evidence supported jury's finding that pvc pole was capable of causing death or serious bodily injury); *McElhaney v. State*, 899 S.W.2d 15, 17 (Tex. App.—Tyler 1995, pet. ref'd) ("[p]ipes and similar objects have been found to be deadly weapons").

The evidence is likewise sufficient to support the judgment of conviction. The jury was entitled to infer intent from Appellant's actions before, during, and after the offense. *See Cary v. State*, 507 S.W.3d 750, 758 (Tex. Crim. App. 2016). Appellant admitted to Detective Gardner that he found the pole on the ground at the Motel 6. Spencer and Mooreing both saw Appellant in possession of the pole before the assault and both testified to him swinging the pole at Spencer. The jury could reasonably infer that Appellant picked up the pole and brought it to the meeting place with intent to cause bodily injury to Spencer, and was entitled to disregard Kimberly's testimony that Spencer was the aggressor. *See Clayton*, 235 S.W.3d at 778*; see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (intent may be inferred from circumstantial evidence); *see also Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) ("guilty" verdict is an implicit finding rejecting defensive theory). Moreover, Spencer testified that Appellant was nowhere to be found after the assault. Officer Rutledge located Appellant inside his hotel room

and he further testified that neither Appellant nor Kimberly had contacted 911. Appellant subsequently refused medical treatment and refused to allow officers to photograph his injuries. The jury could have rejected Kimberly's explanation for Appellant's behavior and reasonably viewed these refusals, coupled with Appellant's failure to contact police and his disappearance from the scene, as consciousness of guilt. *See Clayton*, 235 S.W.3d at 778*; see also Cueva v. State*, 339 S.W.3d 839, 881-82 (Tex. App.—Corpus Christi 2011, pet. ref'd) (any conduct by someone "accused of a crime subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged").

Thus, viewing the evidence in the light most favorable to the State, we conclude that the jury was rationally justified in finding, beyond a reasonable doubt, that Appellant intentionally, knowingly, or recklessly caused bodily injury to Spencer and used or exhibited a deadly weapon during commission of the assault. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(17)(B), 22.01(a), 22.02(a); *see also Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Because the evidence is sufficient to support the jury's verdict that Appellant committed aggravated assault with a deadly weapon, we overrule Appellant's two issues.

## DISPOSITION

Having overruled Appellant's first and second issues, we *affirm* the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered November 5, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

8



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**NOVEMBER 5, 2018**

**NO. 12-18-00039-CR**

**ALFRED EUGENE SIMPSON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 114th District Court
of Smith County, Texas (Tr.Ct.No. 114-0986-17)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*